**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

JOY L. KING,                               )
                                           )
              Plaintiff,                   )
                                           )
vs.                                        )          Case No. 11-cv-576-CVE-TLW
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of Social Security,           )
                                           )
              Defendant.                   )

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Joy L. King seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical

impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if

supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a twenty-seven year old female, applied for Title II and Title XVI benefits on August 18, 2006, alleging a disability onset date of May 30, 2006. (R. 99-100). Plaintiff alleged that she was unable to work due to a back injury and a knee injury. (R. 124-30). Plaintiff's claims for benefits were denied initially on December 4, 2006, and on reconsideration on November 26, 2007. (R. 27-28A, 80, 86). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 68-70). The ALJ held a hearing on August 6, 2009. (R. 451-91). The ALJ issued a decision on August 25, 2009, denying benefits and finding plaintiff not disabled. (R. 7-25). The Appeals Council declined plaintiff's request to review the case; therefore, the ALJ's decision serves as the final decision of the Commissioner. (R. 1-6).

Plaintiff timely appealed the Commissioner's decision. (Dkt. # 2). On appeal, plaintiff alleges three points of error: (1) that the ALJ failed to consider all of the medical evidence; (2) that the ALJ improperly discounted the medical evidence and substituted his own opinion for those of medical professionals; and (3) that the ALJ failed to explain his reasoning for accepting some of the recommended restrictions on plaintiff's residual functional capacity but rejecting others.

## The ALJ's Decision

The ALJ found that plaintiff had severe impairments of "degenerative disc disease, obesity, osteoarthritis of the knees, status post three arthroplasties on each knee, and affective mood disorder and anxiety-related disorder." (R. 12). The ALJ concluded that plaintiff did not meet or medically equal a listing for her physical impairments. (R. 12-13). With respect to

plaintiff's mental impairments, the ALJ applied the special technique and found that plaintiff did not meet the "paragraph B" or "paragraph C" criteria. After giving special consideration to the listings for affective disorders (Listing 12.04) and anxiety related disorders (Listing 12.06), the ALJ concluded that plaintiff's mental impairments did not meet a listing. (R. 12-13).

The ALJ then reviewed the evidence in the record to assess plaintiff's residual functional capacity. The ALJ examined plaintiff's medical records, which showed a history of knee issues beginning in May 2006. (R. 15). Plaintiff had arthroscopy of the right knee in May 2006. Id. Following the surgery, plaintiff began receiving injections to improve her knee function. Id. At the time of her second injection, in June 2006, plaintiff began complaining of back pain. Id. Plaintiff's doctor, Dr. Emil Milo, believed that plaintiff was attempting to do more than she was physically capable of doing, so he advised her to "slow down." Id. Plaintiff requested back surgery in July 2006 due to increased pain, numbness, and weakness in her legs, and Dr. Milo agreed to perform the procedure. Id. Following the back surgery, Dr. Milo advised plaintiff to lose weight and to follow a specific exercise and activity plan. Id. He also prescribed pain medication. Id.

At the end of July, however, plaintiff began complaining that her right knee "locked," causing her to fall. Id. She also complained of numbness in her right leg. Id. Dr. Milo observed plaintiff walking normally, but his examination revealed decreased reflexes and tenderness around the right knee. Id. An MRI was normal, but further examination revealed some issues. (R. 15-16). Due to plaintiff's complaints, Dr. Milo proceeded to perform a second arthroscopy on the right knee. (R. 16). Surgery revealed additional tearing of the medial meniscus. Id. Following surgery, plaintiff failed to follow Dr. Milo's instructions. Id. Plaintiff's mother reported to Dr.

Milo that plaintiff was "hyperactive" and "helping other people" with physical labor. (R. 16). Dr. Milo instructed plaintiff twice to eliminate some of her extra activity. Id.

In late August 2006, Dr. Milo performed arthroscopy on plaintiff's left knee. Id. Plaintiff responded positively to the surgery. Id. She also continued to receive injections in her right knee. Id. In mid-September, Dr. Milo advised plaintiff that she was to receive her last injection at her next appointment. Id. Plaintiff presented at that appointment with complaints that she had fallen and hurt her back. Id. Plaintiff had sought emergency room treatment and, at the time of her appointment with Dr. Milo, was only complaining of mild soreness. Id. Dr. Milo gave plaintiff her last right knee injection. Id.

In late October 2006, plaintiff returned to Dr. Milo, complaining of pain in the right knee. Id. Dr. Milo advised plaintiff that she had already undergone two surgeries on her right knee and would need to learn to live with minor aches and pains. Id. Dr. Milo prescribed pain medication. Id. Plaintiff also complained that she was experiencing symptoms associated with her bipolar disorder diagnosis. Id.

The following month, plaintiff made an appointment with a second doctor, Dr. Ron M. Gann. Id. Plaintiff complained of left hip pain and bilateral knee pain. Id. Dr. Gann could not perform a complete examination of the hip because plaintiff complained of severe pain. Id. Dr. Gann observed "severe pain with palpitation" in plaintiff's left sacroiliac joint and in her lower left spine and diagnosed "continuing muscular strain with sacroilitis." (R. 16-17). An MRI revealed "degenerative disc disease at L4-L5, with rootlet amputation and suggestion of disc herniation to the left at L4-L5." (R. 17). With respect to plaintiff's knee pain, Dr. Gann noted "clicking" on both knees and a possible medial meniscus tear on the right side. Id.

In May 2007, plaintiff began seeing a pain management specialist. (R. 17). Dr. Kalvin White stated that he could not determine whether plaintiff's pain was "arthritic or related to myofascial pain" but believed that plaintiff's pain was "exacerbated by depression." Id. Dr. White prescribed Prozac and Clinoril, a pain medication, to be taken with plaintiff's current pain medication, Norco. Id. Dr. White also ordered plaintiff to begin physical therapy. Id.

Two months later, Dr. White gave plaintiff a sacroiliac joint injection on her right side. Id. Dr. White noted that plaintiff seemed to be doing well with her medication and physical therapy, which included exercising in a swimming pool. Id. X-rays performed that month indicated "only minimal spondylosis." Id. She received a second injection in August 2007 and "reported significant improvement in her pain." Id.

In October 2007, however, plaintiff again complained of lower back, knee, and hip pain. Id. She also asked for an increased dosage of Prozac to help her deal with issues at home. Id. Dr. White's examination revealed some tenderness, but no pain worse than that found in previous examinations. (R. 18). Dr. White ordered plaintiff to continue taking her pain medications and to continue exercising at home. Id. When plaintiff returned to Dr. White in March 2008, she complained of exacerbated back pain. Id. Dr. White treated her pain with multiple steroid injections, renewed her prescriptions, and added a new medication. Id. Medical records from the following month indicated that plaintiff did not regularly take her medication because it gave her insomnia. Id.

Plaintiff began mental health treatment in May 2008. Id. She sought treatment for depression and anxiety. Id. Plaintiff told providers that her depression was a fairly recent development, manifested in "sleep problems" and feeling upset and overwhelmed. Id. Plaintiff was given medication. Id.

Also in May 2008, plaintiff sought treatment at an emergency room following a fall. (R. 18). Plaintiff complained of pain in her right knee and ankle. Id. Visual examination showed no bruising and only slight swelling on the right knee. Id. X-rays were negative.

Plaintiff continued seeing Dr. White, where she received injections to treat her lower back pain. Id. In November 2008, Dr. White advised plaintiff that he did not want to do any more steroid injections until the following calendar year, in an effort to limit plaintiff's exposure to steroids. (R. 19). At that visit, plaintiff complained of pain in her left knee. Id. Dr. White determined that plaintiff's knee pain caused her to limp, also exacerbating her lower back pain. Id. Plaintiff had tenderness in her left knee and in both sacroiliac joints, but it was improved over previous visits. Id. Dr. White renewed plaintiff's prescriptions. Id.

In January 2009, Dr. White performed bilateral injections on plaintiff's sacroiliac joints. Id. She had some improvement following the injections, but she fell shortly after receiving treatment. Id. When plaintiff saw Dr. White in February 2009, she was wearing a "knee immobilizer" on her right knee. Id. Dr. White examined plaintiff's right knee and found swelling and tenderness over the kneecap. Id. Plaintiff then requested that her Prozac prescription be modified, but Dr. White referred that issue to another of plaintiff's physicians. Id.

Plaintiff received another MRI in March 2009, which showed "postoperative changes at L4-L5, with minimal residual bulging disc and question of some compromise of the L4 nerve root." Id. Plaintiff continued to complain of increased back pain in April 2009, and Dr. White gave plaintiff another steroid injection. Id. She received yet another injection in May 2009. (R. 20). X-rays of her knees in June 2009 were "unremarkable. Id.

Throughout this period of time, plaintiff took several trips to Bristow Medical Center for issues with her blood pressure. (R. 18-20). Hospital records from April 2008 and September

2008 contain statements from plaintiff that she was not regularly taking her blood pressure medication. (R. 18, 19). Plaintiff's high blood pressure was controlled with medication, and in May 2009, plaintiff told hospital staff that she no longer experienced numbness. (R. 20). Plaintiff stated during a June 2009 visit that she was doing well on Xanax, that she was no longer experiencing headaches or leg cramps, and that she had stopped taking Norco because it made her feel like "a zombie." Id.

Plaintiff attended a consultative mental examination in January 2009. (R. 23). Plaintiff reported a number of issues, including racing thoughts, mood swings, anxiety, and chronic pain. Id. The consultative examining physician diagnosed plaintiff with "bipolar disorder" and "anxiety disorder with panic attacks." Id. He also noted plaintiff's physical complaints and suggested that plaintiff might also have obstructive sleep apnea. Id. He rated plaintiff's diagnoses as "guarded to poor" because plaintiff was not receiving treatment for bipolar disorder and because sleep apnea could be contributing to both her mental instability and hypertension. Id. The examining physician did state that plaintiff's "functioning would probably improve with treatment of her mood and sleep disorders." Id. The doctor opined that plaintiff could handle "complex vocational tasks," but she would have difficulty with social functioning. Id.

In addition to the medical records, the ALJ also considered plaintiff's own testimony during the ALJ hearing. Plaintiff stated that she had headaches twice a week, each lasting four to five hours. (R. 14). Plaintiff also reported using a cane "most of the time" for the last two years. Id. Even with the cane, however, plaintiff reported falling every one to two months due to numbness in her knees. Id. Plaintiff attributed these issues to her lower back pain. Id. Although plaintiff had not recently received any injections in her lower back, she noted that previous

injections only provided her with relief for ten to fourteen days before the pain began to progress. (R. 14).

Plaintiff testified to no side effects other than a few minutes of drowsiness at night, which she experienced after taking Xanax. Id. Plaintiff described minimal activities of daily living and stated that she could walk only three or four blocks. Id. Plaintiff did admit, however, that she cared for her three-year-old-child and "made no references to difficulties or inability to care for the needs of her child." (R. 21).

The ALJ found that plaintiff was not credible. (R. 20-23). The ALJ noted inconsistencies between plaintiff's subjective complaints and the medical evidence. (R. 20). Plaintiff failed to follow Dr. Milo's orders during the early stages of her treatment. (R. 21). The ALJ acknowledged that plaintiff did have serious medical conditions, as evidenced by her multiple surgeries, but he also found that the surgeries were successful, further undermining plaintiff's continued complaints. Id. Likewise, plaintiff's other conditions responded well to medication, when she took them as prescribed. (R. 21-22).

The ALJ concluded that plaintiff retained the residual functional capacity to perform sedentary work with the following restrictions: (1) "the ability to change positions at will and elevate her feet 10 inches;" (2) "occasionally climb stairs, balance, bend, stoop, crouch, kneel, and crawl;" (3) "unable to climb ladders, ropes and scaffolds;" (4) "avoid concentrated exposure to extreme cold/heat and fumes, odors, dusts, toxins, and gases." Plaintiff did maintain the ability to perform "moderately complex work" but was limited to "superficial contact with co-workers, supervisors and the general public." (R. 13-14). The ALJ found that plaintiff was unable to perform her past work, but she could perform other work, as described by the vocational expert,

including "order clerk," "clerical mailer," and "semi-conductor assembler." (R. 24-25). Accordingly, plaintiff was not disabled. (R. 25).

**Plaintiff's Medical Records**

As the ALJ discussed in great detail in his decision, the bulk of plaintiff's medical records document her issues with bilateral knee pain and lower back pain. In her brief, however, plaintiff focuses solely on the ALJ's decision with regard to the impact that plaintiff's mental health issues have on her residual functional capacity. (Dkt. # 15). Accordingly, the undersigned has concentrated his review on those records documenting plaintiff's affective mood disorder and anxiety-related disorder, which the ALJ found to be severe impairments.

Plaintiff had previously been treated for depression, substance abuse, and depression. (R. 350). In 1992, plaintiff spent nine months in inpatient treatment at Oak Crest Hospital. Id. When plaintiff re-established care with her primary care physician in 2005, she was no longer on any medication for depression, nor did she complain of any mental health issues. (R. 176).

After her knee surgery in June 2006, however, plaintiff's primary care physician diagnosed her with depression and prescribed Effexor.[1] (R. 163). Thereafter, plaintiff began exhibiting signs of agitation, nervousness, and insomnia. (R. 160, 162). In August 2006, her doctor changed her prescription to Xanax.[2] In October 2006, plaintiff's knee surgeon noted in

---

[1] Effexor is used to treat depression, panic disorder, social anxiety disorder, and generalized anxiety disorder. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012623/ (last visited on December 4, 2012).

[2] Xanax is a benzodiazepine used to treat "anxiety, panic disorder, insomnia (trouble sleeping), and anxiety caused by depression." See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008896/ (last visited on December 4, 2012).

plaintiff's chart that "Apparently, her bipolar disorder is acting up again." (R. 177). Plaintiff's primary care physician added Cymbalta in January 2007.[3] (R. 217).

Plaintiff continued on those medications until mid-2007, when plaintiff began seeing Dr. Tony Ho. (R. 205). Dr. Ho referred her to a pain management specialist, Dr. Kalvin White. (R. 316). Plaintiff had initially told Dr. Ho that she "usually takes Xanax" for insomnia. (R. 205). However, Dr. White found that plaintiff's pain "seems to be exacerbated by depression" and "took the liberty of restarting her on her Prozac 20 mg once daily." (R. 312-16). Dr. White found that plaintiff showed improvement with Prozac and other pain medications. (R. 307). In October 2007, plaintiff requested an increase in her Prozac dosage to help her cope with "some difficult times at home." (R. 299). Dr. White agreed and doubled her dosage. Id. In December 2007, Dr. White added a medication to treat plaintiff's insomnia, which was caused by "some new stressors." (R. 297).

Plaintiff did not seek therapeutic treatment for her depression until April 2008, when she presented for treatment at CREOKS. (R. 331-352). A Licensed Marriage and Family Therapist completed plaintiff's initial treatment plan and diagnosed her with "[m]ajor depressive disorder, single episode, moderate." (R. 340). The record does not clearly indicate whether plaintiff was still taking Prozac, as she initially failed to report either current or previous use of "medications previously prescribed for mental health issues." (R. 349). The therapist prescribed only psychotherapy. (R. 340). At an appointment the following month, however, plaintiff met with a

---

[3] Cymbalta is used to treat both depression/anxiety and chronic muscular/bone pain. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010059/ (last visited on December 4, 2012). Based on plaintiff's complaints, which appear to be mainly complaints of physical pain, it is unclear whether Cymbalta was prescribed to treat plaintiff's depression or hip pain. (R. 217).

doctor at CREOKS who prescribed Celexa[4] and Trazodone.[5] Plaintiff told him that her depression had only recently reached a level that required treatment. (R. 334). After these initial appointments, however, it appears that plaintiff abandoned the treatment program. (R. 331-332). The records indicate that plaintiff received no further mental health treatment.

Following an initial ALJ hearing in November 2008, the ALJ sent plaintiff for a consultative psychological examination. (R. 438-450). The ALJ noted that plaintiff's attorney had requested the examination a few days before the hearing. (R. 440). The ALJ explained to plaintiff that the examining psychologist would perform a number of tests. (R. 445-50).

Plaintiff saw Dr. John Hickman, a clinical psychologist, for the consultative examination on January 22, 2009. Plaintiff told Dr. Hickman that "she has been told several times that she has a bipolar disorder but she never knew what that meant and is just being treated for depression by her family doctor." (R. 353). Plaintiff reported taking Prozac daily, which had recently been prescribed by Dr. White. (R. 354, 427-28).

Dr. Hickman performed a number of tests and found the results valid, with the exception of the personality testing. (R. 355, 357). He noted that plaintiff "became more impulsive and manic as the evaluation proceeded." (R. 355). Plaintiff attributed it to her pain, which Dr. Hickman did not find to be exaggerated. Id. Plaintiff reported that "she has to struggle not to be irritable," and Dr. Hickman also noted that plaintiff "appeared frustrated at times" but "remained friendly and cooperative throughout the evaluation." Id. Plaintiff's mood throughout the evaluation was "depressed and anxious with occasional flashes of irritation." Id.

---

[4] Celexa is an antidepressant. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009639/ (last visited on December 4, 2012).

[5] Trazodone is used to treat depression and depression with anxiety. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012504/ (last visited on December 4, 2012).

Dr. Hickman diagnosed plaintiff with "Bipolar disorder, mixed type" and "Anxiety disorder with panic attacks." (R. 358). He noted that plaintiff's "long-term prognosis is guarded to poor because her bipolar disorder is not being treated and is worsening." Id. He believed that plaintiff also had obstructive sleep apnea, which would also contribute to her "mood instability." Id. He opined that "[h]er functioning would probably improve with treatment of her mood and sleep disorders." Id.

Despite these diagnoses, plaintiff functioned in the low average range of mental ability. Id. Dr. Hickman rendered the following opinion:

> Cognitively [plaintiff] could handle complex vocational tasks but her mood swings and irritability would be problematic in maintaining social functions. . . . I do not think [plaintiff] meets any disability criteria currently because her primary disorders are untreated. The combination of her psychiatric and medical difficulties might equal 12.04 if they were present after appropriate treatment of her mood and sleep disorders.

(R. 358-59).

## The ALJ Hearing

The ALJ held a hearing on August 6, 2009. Plaintiff testified regarding her knee surgeries. (R. 458-61). Plaintiff stated that she had not returned to work due to "excruciating pain" and other issues, such as "depression, anxiety, severe hypertension." (R. 461). Plaintiff told the ALJ that she simply could not concentrate and stay on task "for more than 30 minutes." Id. Plaintiff testified that she had similar concentration problems even when she was working. Id. Her biggest problem, she stated, was "[t]he anxiety and agitation." Id. She had received medication for those conditions. (R. 461-62). Plaintiff stated that she had not completed treatment at CREOKS due to a lack of transportation but had recently returned to CREOKS for treatment. (R. 462).

Plaintiff testified that she was currently taking Prozac and Xanax. (R. 463). The Xanax made her drowsy for about half an hour after she took the medication, but otherwise, she had no side effects. Id. Plaintiff also stated that she suffered a lack of concentration due to anxiety, which left her distracted and frustrated. (R. 464). She also became frustrated when dealing with other people. (R. 465). Plaintiff described her current issues as more severe than when she was working and added that the back and leg pain contributed to her anxiety and depression. (R. 466).

Plaintiff further testified that her hypertension and pain kept her from working. (R. 466-71). Plaintiff testified that her pain limited her activities. (R. 466-71). Plaintiff used a cane for walking but was still prone to falls. (R. 473-74). Plaintiff stated that she took care of her daughter, watched television and read for short periods of time, and fixed simple meals. (R. 479-83).

The vocational expert testified that plaintiff had previously worked as a packer, an auto detailer, a housekeeper, and a certified nurse's aide. (R. 486-87). Plaintiff's prior relevant work ranged from light work to very heavy work. Id. The ALJ then posed a detailed hypothetical to the vocational expert for a person who could perform sedentary work with a number of restrictions. (R. 487-88). The vocational expert testified that the ALJ's restriction of no contact with co-workers would prevent her from doing any work. (R. 488). With a restriction of only superficial contact with co-workers, supervisors, and the public (as well as the numerous physical restrictions listed in the hypothetical), plaintiff could perform a number of unskilled sedentary jobs. Id. The vocational expert cited jobs such as an order clerk, clerical mailer, and semi-conductor assembler. (R. 489). The vocational expert testified that the ALJ's limitation on

postural changes and the ability to elevate the feet ten inches would not be a problem in those positions. (R. 490).

## ANALYSIS

Plaintiff raises three issues on appeal, all related to the ALJ's analysis of plaintiff's mental health issues. First, plaintiff contends that the ALJ ignored significant medical evidence in the record. Specifically, plaintiff contends that the ALJ should have considered the mental residual functional capacity assessment completed by Dr. Hickman, as well as the April 2008 CREOKS assessment. Second, plaintiff argues that the ALJ substituted his own opinion for those of the consultative examiner and improperly discredited Dr. Hickman's findings. Finally, plaintiff argues that the ALJ rejected some of the mental restrictions contained in Dr. Hickman's report while adopting others. Plaintiff contends that the ALJ is not permitted to pick and choose from Dr. Hickman's report without a proper explanation for doing so. Because all three of these issues are related to the ALJ's analysis of plaintiff's mental residual functional capacity at step four, the undersigned considers them as a single issue.

An ALJ must make specific residual functional capacity findings. See Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996). Those findings must be supported by substantial evidence. See Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999). A plaintiff's residual functional capacity "represents the most that an individual can do despite his or her limitations or restrictions." SSR 96-8p. The residual functional capacity assessment "must be based on *all* of the relevant evidence in the case record," including medical history, medical signs and laboratory findings, medical source statements, and lay evidence, among other factors. Id. (emphasis in original). The ALJ must discuss "how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence." Id. The ALJ must explain "why reported symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the evidence" Id. The ALJ must also consider and resolve "any material inconsistencies or ambiguities" in the record. Id.

In this case, with respect to defendant's mental health, there are two opinions from acceptable medical sources.[6] See 20 C.F.R. §§ 404.1513, 416.913 (defining acceptable medical sources to include licensed physicians or psychologists). Dr. White, a pain management specialist, diagnosed plaintiff with depression and prescribed medication for treatment. (R. 316). Dr. Hickman, the examining psychologist, diagnosed plaintiff with bipolar disorder and anxiety disorder with panic attacks. (R. 358). Dr. Hickman also opined that plaintiff's mental acuity would permit her to handle complex tasks, but he found that she would have difficulty maintaining social functioning in the workplace. Id.

The ALJ stated that he gave "some weight" to Dr. Hickman's opinion. In conducting the analysis, the ALJ "is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." Haga v. Astrue, 482 F.3d 1205, 1208 (10th Cir. 2007). Plaintiff argues that the ALJ did "pick and choose" from Dr. Hickman's opinion because the ALJ, in citing Dr. Hickman's opinion, only referenced "pages 1-8" in his citation to the record exhibit. (R. 23). Plaintiff argues that the ALJ ignored Dr.

---

[6] Plaintiff argues that the CREOKS April 2008 assessment also qualifies as a medical source opinion and argues that the ALJ erred in ignoring that evidence. That assessment, created by a therapist does not qualify as a medical source opinion because a therapist does not qualify as a licensed or certified psychologist under the regulations. See 20 C.F.R. §§ 404.1513, 416.913. While the ALJ should have considered the assessment generally in his review of the record evidence, the undersigned finds that any error was harmless error because the assessment essentially echoes the diagnoses given by both Dr. White and Dr. Hickman. See Poppa v. Astrue, 569 F.3d 1167, 1173-74 (10th Cir. 2009) (finding harmless error where the ALJ failed to consider whether there were conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles because no conflict existed). The ALJ accepted these diagnoses, as evidenced by his finding that plaintiff had the severe impairments of affective mood disorder, which can include both depression and bipolar disorder, and anxiety-related disorder. (R. 12).

Hickman's medical source statement findings. (Dkt. # 19; R. 360-64). Specifically, Dr. Hickman found that plaintiff had a marked limitation in "[t]he ability to work in coordination with or proximity to others without being distracted by them" and moderate limitations in "[t]he ability to maintain attention and concentration for extended periods," "[t]he ability to perform activities within a schedule. . .," "[t]he ability to complete a normal workday and workweek . . ." and in several areas of social interaction with co-workers and supervisors. (R. 360-64).

The ALJ concluded, however, that plaintiff had the residual functional capacity to perform sedentary work with the following mental restrictions: "moderately complex work" and "superficial contact with co-workers, supervisors and the general public." Contrary to plaintiff's argument, the ALJ's findings are not inconsistent with Dr. Hickman's opinions. Dr. Hickman's single finding of a marked limitation is properly addressed in the restriction that plaintiff have only superficial contact with co-workers. All of Dr. Hickman's other findings of moderate limitations also are consistent with the ALJ's restrictions. Dr. Hickman found that plaintiff could cognitively perform specific tasks but would likely be disrupted; the ALJ found that plaintiff could perform "moderately complex tasks" but then limited his findings at step five to unskilled work. (R. 23, 25, 358). To the extent that the ALJ discounted Dr. Hickman's opinion, the ALJ's concerns rested solely on Dr. Hickman's wholesale acceptance of plaintiff's subjective complaints regarding her physical ailments, and not on his conclusions with respect to her mental limitations. (R. 23).

Accordingly, the ALJ did not substitute his own opinion for that of Dr. Hickman or "pick and choose" the portions of Dr. Hickman's opinion that supported his finding of disability. Rather, the ALJ properly weighed Dr. Hickman's opinion and crafted mental restrictions in plaintiff's residual functional capacity assessment that are supported by the record evidence.

**RECOMMENDATION**

For the foregoing reasons, the undersigned **RECOMMENDS** that the District Court **AFFIRM** the ALJ's decision denying plaintiff's claims for benefits.

**OBJECTION**

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by December 19, 2012.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 5th day of December, 2012.

T. Lane Wilson
United States Magistrate Judge