# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOY L. KING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-0576-CVE-TLW |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Before the Court is the magistrate judge's report and recommendation (Dkt. # 20) recommending that the Court affirm the Commissioner of the Social Security Administration's decision to deny plaintiff Joy L. King's claims for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act. Plaintiff has filed an objection to the report and recommendation, seeking a remand of the case for further administrative proceedings. Dkt. # 21. Defendant has not responded to plaintiff's objection, and the time to respond has expired.

### I.

Plaintiff was born in March 1979 and resides with her daughter and boyfriend. Dkt. # 14-1, at 110; Dkt. # 14-2, at 1. Prior to filing for DIB and SSI, plaintiff held a multitude of jobs, including as a semi-truck detailer, housekeeper, factory packer and assembler, and certified nurse assistant (CNA). Dkt. # 14-2, at 9. Plaintiff filed applications for DIB and SSI, alleging an onset date of May 30, 2006. Dkt. # 14-1, at 110. Plaintiff's claims for benefits were denied initially in December 2006 (Dkt. # 14-1, at 38-39, 97), and on reconsideration in November 2007 (id. at 37, 91). Plaintiff

requested a hearing before an administrative law judge (ALJ), which was granted. Id. at 54, 59, 79-81.

In November 2008, the ALJ held a hearing, at which plaintiff was represented by counsel. Dkt. # 14-5, at 27. The ALJ stated that he was ordering a consultative examination for plaintiff's depression and, therefore, the initial hearing would not proceed "very far." Id. at 27-28. The ALJ inquired about plaintiff's leg brace and cane, and plaintiff stated that she had a lot of pain in her left leg, and that she had problems with both her left and right legs. Id.

In January 2009, plaintiff was referred to John W. Hickman, Ph.D., for a consultative examination. Dkt. # 14-4, at 34. Dr. Hickman observed that plaintiff arrived for her appointment on time and was appropriately dressed. Id. Plaintiff reviewed with Dr. Hickman her history of back surgery and leg pains. Id. Dr. Hickman reported that plaintiff said she is "very depressed, anxious, and struggles not to be irritable with people." Id. Dr. Hickman noted that plaintiff had been "told several times that she has a bipolar disorder," but that she "is just being treated for depression by her family doctor." Id. Dr. Hickman also noted plaintiff's prescribed medications. Id. Dr. Hickman administered numerous tests, and reported that plaintiff "applied herself to the test items and the results are thought to be a valid assessment of her current functioning." Id. at 35-36. Dr. Hickman found that plaintiff was "functioning in the low average range of mental ability," and listed plaintiff's diagnosis as: "bipolar disorder, mixed type," "anxiety disorder with panic attacks," "rule out obstructive sleep apnea," "nicotine dependence," "history of alcohol dependence in long-term remission by claimant report," "sacroiliac joint dysfunction bilaterally, low back pain status post l5 diskectomy, degenerative spondylosis, myofascial pain involving the lower extremities bilaterally, surgical arthroscopy of knees bilaterally, surgery of right wrist fracture," "marked psychosocial

stress from unemployment and financial stress," and "GAF – 55, marked emotional difficulties."

Id. at 39.  Dr. Hickman's reported prognosis was that he

> would not expect much change in [plaintiff's] functioning in the near future.  Her long-term prognosis is guarded to poor because her bipolar disorder is not being treated and is worsening.  She probably has untreated obstructive sleep apnea that contributes to her mood instability and may also be contributing to her reported high blood pressure.  Her functioning would probably improve with treatment of her mood and sleep disorders.

Id.  Dr. Hickman found that "cognitively [plaintiff] could handle complex vocational tasks but her mood swings and irritability would be problematic in maintaining social functions."  Id. at 39-40.  Dr. Hickman further noted that he did not think that plaintiff met "any disability criteria" at that time "because her primary disorders are untreated," but "[t]he combination of her psychiatric and medical difficulties might equal 12.04 if they were present after appropriate treatment of her mood and sleep disorders."  Id.

Dr. Hickman found that plaintiff had a marked limitation, defined as "[s]eriously affects ability to perform basic work functions," in her "ability to work in coordination with or proximity to others without being distracted by them."  Id. at 43.  He found that plaintiff had a moderate limitation, defined as  "affects but does not preclude ability to perform basic work functions,"  in six categories: "The ability to maintain attention and concentration for extended periods;" "The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" "The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" "The ability to accept instructions and respond appropriately to criticism from supervisors;" "The ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes;" and "The ability to maintain socially

3

appropriate behavior and to adhere to basic standards of neatness and cleanliness." Id. In all other categories, Dr. Hickman found plaintiff had either "no significant limitation" or "no limitation." Id. at 42-44.

In August 2009, the ALJ held a supplemental hearing, and plaintiff was again represented by counsel. Dkt. # 14-5, at 40. Plaintiff testified about her living arrangements and educational background. Id. at 42-44. Plaintiff stated that she stopped working because she "underwent back surgery and numerous knee surgeries." Id. Plaintiff testified that she had multiple surgeries on her knees, and that, following the surgeries, plaintiff did not return to work because "[t]he pain was excruciating at that point." Id. at 48. Plaintiff thereafter stated that she has chronic pain, "that at times is excruciating," in her "back, right, and left knee," and that her "back and right knee is [sic] the absolute worst." Id. at 55-56. Plaintiff testified that she had been prescribed pain medications, exercises, and injections in her back and knees for the pain. Id. at 56-57. Further, plaintiff testified that she had other health problems, including "depression, anxiety, severe hypertension." Id. at 48. Plaintiff stated that she received psychological or psychiatric treatment through CREOKS Behavioral Health Services (Creoks). Id. at 49. Plaintiff was prescribed "Xanax for anxiety and agitation," which she stated "helps some," and Prozac. Id. at 50.

Plaintiff stated that she "quit quite a few of the jobs that [she] did have." Id. She testified that she quit because she was "about to get fired," and she felt that she was going to be fired from those jobs because "getting tasks completed in an ample amount of time was hard." Id. at 51-52. Plaintiff stated that "[o]ther people, just frustration" would keep her from staying "on tasks." Id. at 52. Plaintiff testified that she had severe hypertension, which her doctor was "trying to get under control," and it made her dizzy and gave her "frequent headaches." Id. at 53. Plaintiff explained

4

that she used a cane because she fell once every two months, and that she experienced numbness and tingling in her legs, which was alleviated slightly by injections. Id. at 59-61. Plaintiff stated that she had shortness of breath and used an inhaler daily when she worked as a CNA. Id. at 65-66. Plaintiff testified to fairly limited daily activities, including pouring her daughter's cereal, sitting at the park or on the porch, and making dinner. Id. at 65-69.

The ALJ called vocational expert (VE) Michael J. Weisman to testify about the requirements of plaintiff's past work and the availability of jobs in the marketplace that could be performed by a person with plaintiff's limitations. Id. at 72. Plaintiff's counsel had no objections to the VE's qualifications. Id. The VE testified regarding the exertion level of plaintiff's past work as well as the level at which each job was performed. Id. at 73-74. The ALJ asked the VE a hypothetical based upon plaintiff's limitations, including the limitation that plaintiff "should have no contact with co-workers but she could have superficial contact with supervisors and unlimited contact with the public." Id. at 74-75. The VE testified that such an individual would not be able to perform plaintiff's past relevant work because, to perform any job, plaintiff would always have contact with co-workers. Id. at 75. The ALJ asked, if plaintiff could have just superficial contact with supervisors, co-workers, and the public, whether there would be any available jobs, and the VE stated that there would. Id. The VE testified that plaintiff could perform the job of an order clerk, clerical mailer, and semi-conductor assembler. Id. at 76.

On August 25, 2009, the ALJ issued a written decision denying plaintiff's claims for SSI and DIB. Dkt. # 14-1. The ALJ determined that plaintiff had the following severe impairments: "degenerative disc disease, obesity, osteoarthritis of the knees, status post three arthroplasties on each knee, and affective mood disorder and anxiety-related disorder." Id. at 13. The ALJ found that

5

plaintiff's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." Id.  The ALJ found that plaintiff had the residual functional capacity (RFC) to

> occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, push and/or pull consistent with lifting and carrying limitations, stand and/or walk 2 hours in an 8 hour workday, and sit 6 hours in an 8 hour workday. The [plaintiff] must be able to change positions at will and elevate her feet 10 inches. The [plaintiff] is able to occasionally climb stairs, balance, bend, stoop, crouch, kneel and crawl, but is unable to climb ladders, ropes and scaffolds. The [plaintiff] should avoid concentrated exposure to extreme cold/heat and fumes, odors, dusts, toxins, and gases. Additionally, the [plaintiff] can perform moderately complex work and have superficial contact with co-workers, supervisors and the general public.

Id. at 14-15.

Initially, the ALJ summarized plaintiff's testimony from both hearings. Id. at 15. Thereafter, the ALJ reviewed plaintiff's medical history. First, the ALJ noted that plaintiff was seen by Emil Milo, M.D., in May 2006, and that she complained of knee problems. Id. at 16. The ALJ reviewed plaintiff's extensive history of knee and back problems, including multiple visits to Dr. Milo for "Hyalgan injection[s]" and back surgery. Id.; Dkt. # 14-2, at 79.

The ALJ noted that plaintiff saw Ron M. Gann, D.O., in November 2006, complaining of left hip and bilateral knee pain. Dkt. # 14-1, at 17-18. The ALJ reviewed Dr. Gann's examination and findings, and noted that Dr. Gann recorded a history of surgeries on both knees and a "possible medial meniscus tear on the right side." Id. at 18. ALJ noted that plaintiff thereafter saw Kalvin L. White, D.O., a pain management specialist, on May 21, 2007. Id. Dr. White stated that plaintiff's pain could be "arthritic or related to myofascial pain, but . . . appears to be exacerbated by depression." Id. Dr. White "restarted" plaintiff's prescriptions for Prozac and Clinoril, and advised plaintiff "to continue taking Norco." Id. Dr. White also prescribed physical therapy and instructed

plaintiff to return in one month or sooner.  Id.  In October 2007, Dr. White stated that plaintiff had "improved from her initial visit," but plaintiff "requested an increase in her Prozac" because she said she was "having some difficulties at home" and felt it would be helpful.  Id.; Dkt. # 14-3, at 104.  At a follow-up examination in March 2008, Dr. White renewed plaintiff's prescriptions for Norco, Prozac, Vistaril, and Clinoril, and he prescribed "Robaxin, once daily, for the next 10 days."  Dkt. # 14-1, at 18; Dkt. # 14-3, at 100.  The ALJ noted that plaintiff was seen at Bristow Medical Center on April 25, 2008, at which time plaintiff stated that she did not take her medications regularly because they made her "not sleep well."  Dkt. # 14-1, at 19.

The ALJ reviewed plaintiff's records from her follow-up on May 1, 2008 at Creoks.  Id.  The ALJ stated that plaintiff "presented with complaints of depression and anxiety . . . denied suicidal ideation, but stated she 'does not want to do anything.'"  Id.  The ALJ noted that the Creoks record reflected that plaintiff's mood was "depressed and her affect was restricted, but there was no evidence of suicidal ideation or auditory/visual hallucinations," and that plaintiff was prescribed Celexa and Trazodone.  Id.

The ALJ also reviewed plaintiff's medical records from Bristow Medical Center after plaintiff "slipped on the sidewalk and sustained a fall."  Id.  Plaintiff underwent x-rays, which revealed no fractures or other problems.  Id.  The ALJ noted that plaintiff saw Dr. White and underwent sacroiliac joint injections due to her low back pain.  Id.  Plaintiff had a high blood pressure reading in September 2008 and, when she saw Dr. White in November 2008, Dr. White noted that plaintiff had "some improvement since the last injections."  Id. at 20.  The ALJ further reviewed plaintiff's numerous appointments with Dr. White regarding pain in her knees and back.  Id.  The ALJ also noted that plaintiff requested that her prescription for Prozac be changed in

February 2009 and May 2009, but that Dr. White deferred those requests to plaintiff's primary care physician. Id. at 20-21.

The ALJ stated that, "[a]fter giving due consideration to credibility, motivation, and the medical evidence, the Administrative Law Judge is persuaded that the [plaintiff] exaggerates at least some of her symptoms, including disabling pain." Id. at 21. The ALJ reviewed several inconsistencies between plaintiff's testimony and the record evidence and concluded that plaintiff was not "entirely credible." Id. at 21-22. The ALJ found that, "[a]fter careful consideration of the evidence[,] . . . [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Id. at 23. The ALJ reviewed the opinion evidence, specifically the consultative examination done by Dr. Hickman. Id. The ALJ noted Dr. Hickman's reported diagnosis, which included bipolar disorder and anxiety disorder with panic attacks. Id. at 24. However, the ALJ stated that "[i]t appears Dr. Hickman apparently relied quite heavily on the subjective report of symptoms and limitations provided by the [plaintiff] and seemed to uncritically accept as true most, if not all, of what the [plaintiff] reported." Id. Thus, the ALJ stated that he gave "some weight to the opinion of Dr. Hickman," but he found that "most of [Dr. Hickman's] evaluation consists of symptoms, complaints and allegations of the [plaintiff], which he then summarized." Id. at 24-25.

The ALJ found that plaintiff was unable to perform any past relevant work, but that there are "jobs that exist in significant numbers in the national economy" that plaintiff can perform, and therefore plaintiff had not been under a disability from May 30, 2006 through the date of his

decision. Id. at 25. Plaintiff filed this case on September 13, 2011, and the matter was referred to a magistrate judge for a report and recommendation. The magistrate judge entered a report and recommendation (Dkt. # 20) recommending that the Court affirm the Commissioner's decision to deny plaintiff's applications for benefits.

## II.

Without consent of the parties, a court may refer any pretrial matter dispositive of a claim to a magistrate judge for a report and recommendation. However, the parties may object to the magistrate judge's recommendation within 14 days of service of the recommendation. Schrader v. Fred A. Ray, M.D., P.C., 296 F.3d 968, 975 (10th Cir. 2002); Vega v. Suthers, 195 F.3d 573, 579 (10th Cir. 1999). The Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The Court may accept, reject, or modify the report and recommendation of the magistrate judge in whole or in part. Fed. R. Civ. P. 72(b).

## III.

Plaintiff raises four objections to the magistrate judge's report and recommendation. Dkt. # 21. First, plaintiff argues that the magistrate judge improperly conflated plaintiff's specific objections into a singular discussion of whether substantial evidence supported the ALJ's mental RFC assessment. Second, plaintiff argues that the magistrate judge based his report and recommendation on an improper harmless error standard. Third, plaintiff claims that the magistrate judge's finding that the ALJ's mental RFC findings are consistent with Dr. Hickman's mental RFC assessment is contrary to the evidence and controlling case law. Finally, plaintiff argues that the magistrate judge's finding that the ALJ was not required to discuss the opinions reflected in the

Creeks client assessment report conflicts with SSR 06-03p. Defendant has not responded to plaintiff's objections.

The Social Security Administration has established a five-step process to review claims for disability benefits. See 20 C.F.R. § 404.1520. The Tenth Circuit has outlined the five step process:

> Step one requires the agency to determine whether a claimant is "presently engaged in substantial gainful activity." [Allen v. Barnhart, 357 F.3d 1140, 1142 (10th Cir.2004)]. If not, the agency proceeds to consider, at step two, whether a claimant has "a medically severe impairment or impairments." *Id*. An impairment is severe under the applicable regulations if it significantly limits a claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. § 404.1521. At step three, the ALJ considers whether a claimant's medically severe impairments are equivalent to a condition "listed in the appendix of the relevant disability regulation." *Allen*, 357 F.3d at 1142. If a claimant's impairments are not equivalent to a listed impairment, the ALJ must consider, at step four, whether a claimant's impairments prevent her from performing her past relevant work. *See Id.* Even if a claimant is so impaired, the agency considers, at step five, whether she possesses the sufficient residual functional capability to perform other work in the national economy. *See Id.*

Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). The ALJ decided this case at step five of the analysis and found that plaintiff possessed the RFC to perform other work in the national economy. Dkt. # 14-1, at 25.

The ALJ issued a written decision that was reviewed by the Appeals Council, which is a final decision by an administrative agency. Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008). The Court may not reweigh the evidence or substitute its judgment for that of the ALJ but, instead, reviews the record to determine if the ALJ applied the correct legal standard and if his decision is supported by substantial evidence. Id. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." Hamlin v. Barnhart,

365 F.3d 1208, 1214 (10th Cir. 2004). The Court must meticulously examine the record as a whole and consider any evidence that detracts from the Commissioner's decision. Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994).

## A.

Plaintiff's first objection is that the magistrate judge improperly conflated plaintiff's specific objections into a singular discussion of whether substantial evidence supported the ALJ's mental RFC assessment. Dkt. # 21, at 3. Plaintiff raised three arguments in her opening brief. Dkt. # 15, at 6. First, plaintiff argued that the ALJ ignored significantly probative evidence. Id. Second, plaintiff alleged that the ALJ substituted his own opinion as medical evidence and discredited medical opinions of the consultative examiner for illegitimate reasons. Id. Third, plaintiff argued that the ALJ failed to explain why some of the restrictions noted by the consultative examiner were rejected while the ALJ appeared to adopt others. Id. The magistrate judge found that plaintiff's alleged errors "all related to the ALJ's analysis of plaintiff's mental health issues." Dkt. # 20, at 15. Therefore, the magistrate judge stated that, "[b]ecause all three of these issues are related to the ALJ's analysis of plaintiff's mental residual functional capacity at step four," he would consider the three alleged errors as a single issue. Id.

Plaintiff argues that the magistrate judge's conflation of the three alleged errors "fogs the issue" and makes it "difficult to differentiate" the issues on appeal. Dkt. # 21, at 3. Plaintiff requests that this Court separately address the specific issues raised by plaintiff.

11

**1.**

Plaintiff's first alleged error, raised in her opening brief, is that the ALJ ignored significantly probative evidence. Dkt. # 15, at 6. More specifically, plaintiff argued that the ALJ failed to adequately discuss Dr. Hickman's evaluation and the Creoks client assessment report (report).[1] Id. at 7-8. The magistrate judge noted that, "with respect to [plaintiff's] mental health, there are two opinions from acceptable medical sources," including Dr. White and Dr. Hickman. Dkt. # 20, at 16. In a footnote, the magistrate judge found that the report, because it was created by a therapist, did not qualify as a medical source opinion. Id. at 16 n.6; 20 C.F.R. §§ 404.1513, 416.913. The magistrate judge noted that "the ALJ should have considered the assessment generally in his review of the record evidence," but found that "any error was harmless." Dkt. # 20, at 16 n.6.

The report was completed by a therapist and addressed plaintiff's limitations in various areas. Dkt. # 14-4, at 21. Specifically, the report contains a score for various areas of functioning, including "feelings," "mental," "family," and "interpersonal." Id. at 20-26. The scores are based upon guidelines provided by the Oklahoma Health Care Authority, and scores in the 30-39 range represent a moderate to severe dysfunction. Oklahoma Foundation for Medical Quality Medicaid Pre-Authorization Program and the Oklahoma Health Care Authority, Provider Manual, 30-33 (2004), available at http://www.okhca.org/provider/policy/documents/OPManual3-05.doc. Plaintiff's scores fell between 30 and 39 in all areas. Dkt. # 14-4, at 20-24. And, the report includes a Global Assessment of Functioning (GAF) score of 45-46, which reflects "serious symptoms . . . [or] serious impairment in social, occupational, or school functioning." Keyes-

---

[1]    Plaintiff also raises this objection as her fourth overarching argument in her objection to the magistrate judge's report and recommendation. Dkt. # 21, at 10.

Zachary v. Astrue, 695 F.3d 1156, n.1 (10th Cir. 2012). The record also contains follow-up visits and notations from a therapist on April 22 and April 29, 2008, which the ALJ similarly failed to discuss. Id. at 18-19.

The report was completed by a therapist, which does not qualify as a medical source opinion. 20 C.F.R. §§ 404.1513, 416.913 (defining acceptable medical sources to include licensed physicians or psychologists). However, Social Security Ruling 06-03p: Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, clarifies how opinions from sources that do not qualify as "acceptable medical sources" should be considered. Evidence from "other sources," including therapists and licensed clinical social workers, should be used to "show the severity of the individual's impairment(s) and how it affects the individual's ability to function." Id. Although such evidence "cannot establish the existence of a medically determinable impairment," it can provide "insight into the severity of the impairment(s)." The report includes an assessment that substantiates plaintiff's claims, and it also includes an assessment that plaintiff's impairments may have been more severe than either Dr. Hickman or Dr. White opined that they were. Id. Therefore, it is clear that the ALJ should have discussed the report. Although the magistrate judge conceded that the ALJ should have discussed the report, the magistrate judge found that, because "the assessment essentially echoes the diagnoses given by both Dr. White and Dr. Hickman," any error was harmless error. Dkt. # 20, at 16.

The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." Fischer-Ross v. Barnhart, 431 F.3d 729, 733 (10th Cir. 2005). Harmless error analysis

may be appropriate if "based on material the ALJ did at least consider (just not properly), [the court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004). If harmless error analysis is "too liberally embraced, it could obscure the important institutional boundary . . . [that] courts avoid usurping the administrative tribunal's responsibility to find the facts. Second . . . it risks violating the general rule against post hoc justification of administrative action." Id. (citing SEC v. Chenery Corp., 318 U.S. 80 (1943)).

The Tenth Circuit has discussed harmless error analysis in social security disability cases. Id. For example, the Tenth Circuit found, in Gay v. Sullivan, 986 F.2d 1336, 1341 n.3 (10th Cir. 1993), that a minor technical error was not enough to "undermine confidence in the determination of th[e] case." Harmless error was also used when an "'ALJ's conduct, although improper, d[id] not require reversal' because the procedural impropriety involved had not 'altered the evidence before the ALJ.'" Allen, 357 F.3d at 1145 (citing Glass v. Shalala, 43 F.3d 1392, 1396-97 (10th Cir. 1994)). Harmless error analysis is not appropriate where, as here, the report lends credibility to plaintiff's allegations of disabling symptoms. Although the assessment contained in the report could not have formed a basis for finding a medically determinable impairment, the finding that plaintiff had moderate to severe dysfunctions in all areas should have been considered and weighed by the ALJ, especially because the report may support a finding of a greater impairment than found in the other medical opinions in the record. Because a reasonable adjudicator could have, if all of the evidence had been properly considered, found that plaintiff was disabled, harmless error analysis is inappropriate.

The Court declines to reach plaintiff's other objections to the report and recommendation because the ALJ's failure to adequately discuss the Creoks client assessment report is a sufficient reason to remand the case for further proceedings.

**IT IS THEREFORE ORDERED** that the report and recommendation (Dkt. # 20) is **rejected**, and the Commissioner's decision to deny plaintiff's claim for disability benefits is **reversed and remanded** for further proceedings.  A separate judgment is entered herewith.

**DATED** this 7th day of January, 2013.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE